## Cutler Estate (No. 2)

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Paul I. Guest* and *Joseph E. Greene, Jr.,* for exceptant.

*Frederick H. Starling,* contra.

BURKE, J., May 15, 1964.—Exceptions were taken to the decree of the learned hearing judge dismissing an appeal admitting to probate a writing dated September 25, 1960, purporting to be the last will and testament of decedent.

The disputed document provides as follows:

"To ~~Thomas Dawson, Jr.~~

TO WHOM IT MAY CONCERN SEPT. 25th 1960
I WANT MY DAUGHTER MABEL NUGENT
TO HAVE MY 15,000 DOLLARS THAT IS IN
MY SAFE DEPOSIT BOX.
(Signed)     Paul D. Cutler
WITNESS (Signed)     David S. Thompson"

The document was typewritten on a brown pressboard card, 5¾" by 2¾". It appears that the card was cut from a Manila envelope with scissors.

Decedent, a widower, was 82 years of age and had been employed in a minor clerical capacity for many years by the Automatic Fire Alarm Company, in its office in the Bourse Building, Philadelphia, Pa. His associate in the office was David Thompson with whom he had had an intimate association for over three years, by reason of their having worked together on the same shifts.

The quiescence of the night shift was conducive to conversations of a personal nature. Decedent had discussed his daughter, Mabel Nugent, with Thompson and his intention to leave her his cash in a safe deposit box. He also had mentioned an Olive Strickland, a lady friend, who also had access to the safe deposit box. Decedent had written a will giving the cash to his said daughter and had shown it to Thompson.

Early in the morning of September 25, 1960, when decedent and Thompson were alone, Thompson heard

decedent using the typewriter in an adjoining room. Decedent then came to Thompson and exhibited the disputed document to him which decedent had already signed in pencil and asked that he read it and act as a witness. Thompson noted that the text was almost identical with that of an earlier will, favoring the daughter, which decedent said he had lost. After reading the document, Thompson signed as a witness. This document was contested by Olive Strickland, the principal legatee in a will dated May 1, 1954, which had been probated and the Register of Wills, after extensive hearings, probated the disputed document, by decree dated September 11, 1962, from which an appeal was taken.

The cardinal point of exceptant's case is forgery by typewriter; specifically, that the will was typed over a preexisting pencilled signature of decedent, which is admittedly genuine, and that the body of the will was prepared by or on behalf of decedent's daughter subsequent to the date shown.

The contestant adduced the testimony of an employe of the typewriter repair company and also offered in evidence the company's invoices which lacked specificity with respect to the existing defects and noted corrections. The witnesses testified merely to the usual services performed in such instances without direct testimony on the subject typewriter.

Exceptant produced testimony by a Mr. Osborn, an examiner of disputed documents, to the effect that the will could not have been typed on September 25, 1960. His opinion was founded on defects in the typewriter which allegedly first appeared after the machine was repaired on November 30, 1960, but which he claims also appear in the disputed will. The defects he noted were horizontal and vertical alignments. He contended that it would be improbable for the defects which appear after repair, to have been present before repair.

In the conduct of his comparative studies of pertinent documents, Mr. Osborn analysed cards written on the subject typewriter made before September 25, 1960. It was the custom of one Andrew Keaveney, an employe of Automatic Fire Alarm Company, to type cards for his information, in the ordering of service for customers and the date of installation of service. These cards were typed and dated on the receipt of the order and were then filed. The cards were reinserted in the typewriter and dated when the service was installed.

Mr. Osborn testified that upon the reinsertion of the cards it was highly improbable that the same alignment of the later typing could be in alignment with the initial typewriting. Keaveney appeared as a witness for the proponent, and gave a demonstration in the court room by making an initial typewriting, removing the card and adding additional typewriting. The alignments were then checked with a measuring glass, having minute graduations. The demonstrations were made on four cards on one of which Mr. Osborn, by use of his measuring glass, could find no deviation, while on the remaining three it was minimal. The hearing judge, with the aid of the measuring glass, also studied the demonstration cards, but found no deviations in the alignments.

During the course of the hearing held on March 14, 1963, Mr. Osborn made a casual reference to a will of decedent, dated December 14, 1959. This document was lodged in a safe deposit box under the control of the contestant. Up to that time nothing had been heard about such a document and the hearing judge immediately directed both parties to go to the box and return with the document. During the course of the hearings Mr. Osborn never testified to any comparative study he made between the typewritings on the 1959 document and the disputed will.

The document is a lined file card of heavy paper, 6 by 3 inches. On one side the following typewriting appears:

"TO WHOM IT CONCERN.     SAFE DEPOSIT BOX 1858

MY CO SIGNER IS MR. L. W. THOMASON

WITH THE ASSISTENT OF MRS. OLIVE A. STRICKLAND

5630 HATFIELD ST. WEST PHILA. PA.

SIGN BYME

May 14, 1957     (Signed)   Paul D. Cutler

(Written) Box 1858 (written) Over the other side."

On the obverse side the following handwriting appears:

"To Whom Concern.

The money in this box
to be given to Mrs. Olive A. Strickland
5630 Hatfield

Sign

Date 3. 1959     Paul D. Cutler
12-21-1959"

There was a holographic will dated May 1, 1954, written on the stationery of the Automatic Fire Alarm Company which was probated on June 20, 1961, one day following decedent's burial. It provided:

"To Whom Concern        5-1-1954

The amount of money in
this box is to go to Mrs.
Olive A. Strickland #5630
Hatfield St. West Phila.
Phone Sa 9-5019 This is my
request in case of My Death.
(Signed)   Paul Cutler
67 High        ~~#94 E. Haines~~
Germantown
Pa. 44

1st Floor Apt.
East."

A comparison of the type print on the 1959 document with the disputed document (1960), reveals similarities which are noted by the learned hearing judge in his opinion at page 7, as follows:

1. Both instruments are typed on heavier than ordinary writing paper, one being of pressboard type material and the other cut down from a larger filing card;

2. Both instruments are almost exactly the same width and length, the 1959 will being wider but shorter;

3. Both instruments have been hand cut from a larger material surface in that four edges of the September 25, 1960, writing are unevenly cut (N.T. p. 189), whereas two and possibly three edges of the 1959 paper bear this same characteristic;

4. Both instruments have been signed "Paul D. Cutler";

5. Both instruments are almost exactly the same in content with the exception of beneficiary designation;

6. Both instruments have some identical typing features; as to the 1959 will, these appear on other side of will and bear a 1957 date—for example, observe (a) that typewritten portion of both instruments slants upward from left to right and (b) letter alignment in both instruments of "ER" in "CONCERN" is identical, and (c) capital "I" is used for figure "one" instead of "1".

A comparison of the phraseology in the 1954, 1959 and 1960 documents is revealing as to the identity of the scrivener. The salutations are: In the 1954 document: "To whom concern." In the 1959 document it is "To whom concern", and on the obverse side the typed script is "To whom it Concern", and in the 1960 docu-

ment "To whom it may concern". On the obverse side of the 1959 document (typewritten instructions relating to the safe-deposit box) "safe-deposit is spelled without a hyphen as it is in the 1960 document. It is also noted that in both the 1959 document (typewritten side), and the 1960 document the capital "(i)" is used in place of the numeral "one". The consistency of the grammatical and typewritten errors in the three writings is persuasive of testator's authorship of the disputed will.

Decedent was buried on June 19, 1961, and Mabel Nugent, decedent's daughter, went to his apartment on High Street, Germantown, on June 20, 1961, to inspect his furnishings. She found several end-tables, two mirrors and a picture of her grandmother, which were placed in her husband's car. The following day she removed the furnishings to her own car for later transportation to her Wildwood, New Jersey, apartment. This furniture was driven to Wildwood on the evening of June 23rd and unloaded on June 24, 1961.

Mrs. Nugent, who operated an apartment house in Wildwood, had a maid and a handyman employed to assist her in the operation of the apartments. On June 24th she arranged for the handyman to unload the car containing the furniture. The handyman in unloading the mirrors, called to Mrs. Nugent about an envelope attached to the back of one mirror. He brought the mirror into the apartment house and she, noting an accumulation of dirt on the reverse side of the mirror, stated that she would clean it. She then noted an envelope of the Automatic Fire Alarm Company attached with thumb tacks, and asked the maid to get her a knife to help remove the tacks.

Upon removal of the envelope and an examination of the contents, she described what appeared to be her father's will, and announced to her husband, the maid and the handyman, that "my father left me a will."

At the time of its discovery it was approaching the closing hour of the postoffice; she hurriedly went to the postoffice and mailed the disputed document to Mr. Starling, her attorney in Philadelphia.

The exceptant infers that the disputed document was contrived through the machinations of Mrs. Nugent and the other witnesses to the discovery of the document on June 24, 1961. Three of the four witnesses testified, and their testimony was uncontradicted and unqualified after rigorous cross-examination. The exceptant also implied that Mrs. Nugent, having gone to her father's office and examined the contents of his locker, after being advised by an attending nurse that he was in extremis, was in a position to fabricate a will favorable to her.

The testimony does show that Mrs. Nugent went to her father's office on June 13, 1961, and examined the contents of his locker. However, at such examination she was accompanied by Mr. Curran, an executive of the company, and Mrs. Schaffer, an executive's secretary, and it is not susceptible of belief that those persons would have permitted the removal of any documents prior to the appointment of a fiduciary. In addition, it is not likely that between June 20th and 24th, Mrs. Nugent could have conspired with two strangers to compose a spurious will. Any contrary inference is rebutted by the lexical and typing patterns of decedent as expressed in previously written documents and discussed hereinabove.

To suggest that Mrs. Nugent had any association with the fabricating of the 1960 document is inane. The record does not disclose that she had any knowledge of her father's grammatical and typewriting deficiencies, as shown in the 1959 documents, prior to March 14, 1963, when it was disclosed for the first time, after having been in the sole possession of exceptant.

Exceptant's case rests solely on conjecture and suspicion. In Obici v. Third National Bank & Trust Company of Scranton, 381 Pa. 184, 190 (1955), the court said: "This Court has repeatedly held that suspicion and conjecture do not take the place of evidence: [citing cases]."

Mr. Thompson, the subscribing witness to the disputed document, made a favorable impression on the hearing judge. He had testified before the Register of Wills and twice before the hearing judge, and his testimony was unshaken after brisk cross-examination. He is a disinterested witness, and having been a subscribing witness to the disputed document, our decisional law accords much greater weight to his testimony than that of opinion evidence.

In Kadilak Will, 405 Pa. 238, 243 (1961), the court said:

"The party relying on fraud or forgery has the burden of proving the facts upon which the alleged fraud or forgery is based, and these facts must be proved by evidence which is clear, direct, precise and convincing: [citing cases].

"Moreover, opinion evidence of an expert, whether he be a doctor or any other kind of expert, is, in cases of forgery, undue influence, mental capacity and insanity, of very little weight and cannot prevail against direct factual credible evidence: [citing cases]."

The record supplies abundant evidence to support the findings of fact and the conclusions of law of the hearing judge. Where an auditing judge sees and hears the witnesses, it is for him to determine their credibility and the weight to be given to their testimony, because of their character, intelligence and knowledge of the subject, and his findings, like those of a jury, will not be disturbed except for clear error: Roberts Estate, 350 Pa. 467 (1944).

For the foregoing reasons the exceptions are dismissed.

## Concurring Opinion sur Exceptions

LEFEVER, J., May 15, 1964.—The evidence presented in support of the validity of the questioned will before us is so fantastic as to beggar belief.

In many respects the instant case is similar to Lare Will, 352 Pa. 323. In his dissenting opinion therein, at page 340, Mr. Chief Justice Maxey made the following pertinent suggestions for evaluating evidence in forgery cases:

"In human affairs we accept as true those things which are highly probable and as untrue those things which are highly *im*probable. Thayer in his 'Treatise on Evidence,' says, p. 272: 'What is called the "legal mind" is still the human mind, and it must reason according to the laws of its constitution.' That Mrs. Lare ever wrote the will her husband presented for probate is so highly improbable that only an immature and gullible mind would believe it. The following are some of the circumstances which convince me that this will is a fraud:

"1. While, of course, a will can be written on a bank check form, it is so unusual for anyone to do so when ample paper is available and there is no necessity to write a will on a bank check form, that when an alleged will so written is offered for probate it naturally excites suspicion as to its genuineness. Before it is accepted as a will there ought to be some plausible explanation as to why the alleged testator chose to write a will on such a small piece of paper, and on the side of it which contained printed matter instead of the side of it which was blank . . ."

Similarly, in the instant case, there are a number of circumstances which strongly indicate that the disputed will was forged by superimposing typewritten

words above a genuine signature of decedent. Some of them follow.

1. *The nature of the will*

The alleged will "was typewritten on a brown pressboard card, 5-¾″ by 2-¾″. It appears that the card was cut from a Manila envelope with scissors." [1] Three horizontal printed lines divide the document into four equal sectors.

In the top sector appears the printed word "TO." Following this is the penned signature or handwritten name "Thomas Dawson, Jr.," through which several pencilled lines have been drawn. In the next sector appear the crucial typewritten words:

"TO WHOM IT MAY CONCERN.

SEPT. 25th 1960.

I WANT MY DAUGHTER MABEL NUGENT TO HAVE MY 15,000 DOLLARS THAT IS IN MY SAFE DEPOSIT BOX."

The bottom of the "J" from the "Jr.," of handwritten "Thomas Dawson, Jr.," extends from the first sector through the printed line and encircles the typed word "MY" which precedes "15,000 Dollars." The third sector is entirely filled with the large pencilled signature "Paul D. Cutler." The fourth sector contains the typewritten word "WITNESS," followed by the signature in ink, "David A. Thompson."

Everything is carefully inserted between the printed lines. Significantly, the top quarter of this small document contains printing and a signature, unexplained and completely extraneous to it; the crucial typewritten portion occupies only one quarter of its limited space; and testator's excessively large signature fully occupies the third quarter.

Why did decedent type his will on a Manila envelope? Where did the envelope come from? Why did he use

---

[1] Majority opinion, page 1.

the side of the envelope containing printed lines and the signature "Thomas Dawson, Jr.," rather than the blank side as he did when he wrote Exhibit C-14? Why not use available Automatic Fire Alarm stationery, as he did when he wrote his 1954 will, or the "regular white paper from the office" or "a sheet of paper" which Thompson testified decedent used for earlier drafts (N.T. pp. 549 and 553)? Why did he sign it *before* showing it to Thompson instead of in front of him? Significantly, no one saw decedent sign this document.

### 2. *The place where the will was discovered*

The story of finding the questioned document is fanciful. It was allegedly hidden in a small light brown envelope which was fastened by thumb tacks to the back of a wall mirror in decedent's apartment. This envelope bore the legend "Automatic Fire Alarm Company, Consolidated Fire Alarm Division, 1384 Bourse Building, Philadelphia 6, Pa.," stamped upon the upper left face of it, with no other descriptive language upon it. Even more bizarre, proponent removed this mirror from its position in decedent's apartment without observing the alleged will, and wrapped and transported it to her apartment in Wildwood, New Jersey, where the will was dramatically discovered in the presence of many witnesses.

This was a most unusual place for decedent to lodge his will. It was very unlikely that proponent would discover it here; and proponent's testimony indicates that she almost did not find it. Was not his safe deposit vault where he kept the bulk of his estate, his 1954 will and other important writings, the logical place for decedent to lodge his will? If decedent feared, or was dominated or influenced by Mrs. Strickland, and there is nothing but conjecture to indicate that this was so, why did he not entrust his will for safekeeping with this close friend, Thompson, or Lawrence W. Thomp-

son, Vice President of the Automatic Fire Alarm Company, in whom he had previously reposed confidence, or place it in his locker, where he had allegedly kept earlier wills? Or most natural of all, why did he not mail it to his daughter? That decedent placed it in an envelope and fastened it to the back of a mirror in his apartment and proponent removed the mirror without discovering it is incredible. Moreover, Ruth Jacobs who worked for decedent for 10 years, regularly did his laundry, and cleaned the apartment and helped him set up his furniture when he moved into it some months before his death, testified that she had never seen this mirror and, as far as she knew, this mirror had never been in decedent's apartment.

### 3. *The signature on the will*

The alleged will is signed *in pencil*.

Despite diligent search by contestant and repeated demands upon proponent to produce such a signature, no other pencilled signature of decedent was uncovered. Thompson testified that several weeks before he had criticized decedent for typing his signature on a will and that when decedent showed him the questioned will he criticized him for signing it in pencil. However, despite these criticisms and the fact that decedent signed in *ink* safe deposit documents, prior wills, check endorsements, income tax forms, and all other documents of record, decedent was allegedly adamant that a pencilled signature on this important document, his will, was adequate!

The record before us contains photostats of numerous genuine signatures of decedent, either "Paul D. Cutler" or "Paul Cutler," bearing dates from 1952 to January 23, 1961. They were endorsements on pay checks, signatures on the safe deposit contract and entry cards, signatures on federal income tax "Employees' Withholding Exemption Certificate," and signatures on

prior alleged testamentary writings (Exhibits C-1, C-2, C-Q3; C-14 and P-9). These signatures of decedent reveal firm, clear, regular, flowing writing until 1959 or 1960. Exhibit C-1 clearly demonstrates that subsequent to July 1, 1960, decedent's signature became increasingly more halting, awkward, faltering, irregular, broken, and effortful: the obvious and traditional hallmarks of advancing age or illness.

It seems impossible that the aged, ill decedent, whose endorsements on his pay checks from July 1, 1960, to January 23, 1961, were so irregular and faltering, could have, on *September 25, 1960*, written the flowing, regular, firm, healthy signature which appears on the disputed will. The differences cannot be explained by the fact that the signature on the questioned will is in pencil and the specimens are in ink. Furthermore, decedent's alleged explanation of his use of pencil on the disputed will was that the signature is "good enough. I can't write so good in ink. . . I am too nervous." The signature on the disputed will is obviously *not* a "nervous" one.

### 4. *The disputed will completely cuts out contestant*

Decedent had been estranged and separated from his wife for upwards of 30 years. He and Mrs. Olive Strickland had been intimate friends for many years. Witnesses at the trial referred to her as decedent's "lady friend." From December 29, 1952, until his death, he and she maintained safe deposit box number 3140 in the Land Title Bank and Trust Company, with right of access reserved to either separately or to the survivor, and each had a separate key. In this box, to which she had separate access, reposed the bulk of decedent's estate, consisting of $15,000 to $18,000 in cash. He executed a will, dated May 1, 1954, giving Mrs. Strickland all of the money in the box; and on December 21, 1959, he executed another document giving all the

money in the box to her (Exhibit C-14); these documents were found in this safe deposit box after his death.

Decedent often had dinner with Mrs. Strickland. She regularly telephoned him at his place of work and was known to his fellow employes as his "lady friend." She assisted in his admission into the hospital for his final illness. In contrast, decedent specifically directed Thompson not to tell his daughter, the proponent, of his hospitalization, and became indignant and angry when Thompson suggested that he would do so. Mrs. Strickland constantly visited him in the hospital, cashed checks for him, arranged for payment of his bills and generally attended to his welfare during his last illness. She was the informant on his death certificate. Yet, the disputed will, if valid, leaves nothing to this intimate friend of many years, who was the primary beneficiary in his 1954 will.

### 5. *The significance of Exhibit C-14*

Both the learned hearing judge and the majority place great emphasis upon the similarity in form, in language, and in typographical peculiarity between the disputed will and Exhibit C-14,[2] which was found in the safe deposit box of decedent after his death. They draw the inference from this apparent similarity that both documents must have been typed by decedent. To the contrary, however, the record shows that a copy of the contents of both sides of Exhibit C-14 was included on page 3 of the inventory of decedent's safe deposit box (Exhibit C-33) which was delivered by contestant's lawyer to the office of proponent's counsel on June 22, 1961 (N.T. pp. 599 to 601).

In law, knowledge of the agent is knowledge of the principal. In fact, it is clearly inferable in this case that proponent saw the copy of Exhibit C-14 in her

---

[2] Reproduced in entirety on page 4 of majority opinion.

counsel's office *two days before* the remarkable appearance of the disputed will on the back of the mirror—all witnesses agreed *that the discovery occurred on the evening of June 24, 1961.* This provided proponent with two full days in which to create the disputed document by typing the alleged words of gift above a genuine, ancient, pencilled signature of decedent on a Manila envelope in her possession, with or without Thompson's help, and then cutting the envelope down to its present size. If she did this, she would have logically followed the language and format used by decedent in Exhibit C-14, which came to her attention on June 22, 1961.

It follows that the similarity of language between Exhibit C-14 and the disputed will, rather than serve to authenticate the disputed will, challenges its validity. Moreover, the disclosure of the contents of Exhibit C-14 to proponent's counsel on June 22, 1961, refutes proponent's argument that Exhibit C-14 had never been called to the attention of the proponent or the court prior to the trial.

### 6. *The Expert's Opinion*

The findings and testimony of Paul A. Osborn, contestant's expert on questioned documents, corroborate contestant's theory that the will was forged.

Osborn was of the opinion that the typing on the disputed will must have been done *after* the machine was returned from full overhaul and repair on November 30, 1960, because of characteristic differences in specimens of prerepair and post-repair typing, viz.: the alignment and position of the letters "A" and "E"; the appearance of red marks from the red-black ribbon on both post-repair typing and the alleged will; and the difference in the wear of the ribbon. He was also of the opinion that the signature on the disputed will could not have been written by decedent on September 25, 1960.

### 7. *Was the questioned document a will?*

The disputed document does not contain a single word to indicate that it is a will or that it was intended to take effect *after death*. This is in glaring contrast to decedent's 1954 short holographic will which provided: "The amount of money in this box is to go to Olive Strickland . . . This is my request *in case of my death*." (Italics supplied.) Moreover, there is no dispositive language in the document; at best it is precatory. Finally, the disputed document was not found in the usual place for a will, i.e., a safe deposit box; a home safe or tin box or desk where valuable papers are kept; or in the custody of a lawyer, trust company or friend. The foregoing are requisites for the document to constitute a will: Steiger Estate, 16 D. & C. 2d 79.

There is real doubt that such ambiguity is present in the questioned document as to permit use of extrinsic evidence to prove that it is a will.[3] In any event, the sole evidence to transform the questioned document in the instant case into a will is the testimony of Thompson that decedent exhibited it to him on the night of September 25, 1960, and said, in effect "this is my will."

The foregoing circumstances and reasons have raised grave doubt in my mind that the questioned document is the will of decedent. Per contra, it would appear that proponent had discovered the pencilled signature of decedent on a brown envelope; had somehow obtained

---

[3] Judge Shoyer, when the instant case was first before this court, properly set forth the rules of law with respect to admission of extrinsic evidence to prove a document to be a will: Cutler Estate, 27 D. & C. 2d 431, 436 et seq. (1961). Therein, he cited many cases and came to the conclusion that on the allegations in the pleadings then before him, the qustioned document "is, prima facie, testamentary in character . . ." He relied heavily on Kauffman Will, 365 Pa. 555. An examination of that case shows facts quite different from the facts in this case, which were conclusive that Miss Kauffman intended the disputed document in that case to be a will.

access to the manual Smith-Corona typewriter in the Automatic Fire Alarm office sometime after November 30, 1960; and had superimposed the typing of the alleged will above decedent's genuine signature. If I were the hearing judge, I would so find on this record. In the alternative, I would exercise the discretion vested in this court by section 745 (c) of the Orphans' Court Act of August 10, 1951, P. L. 1163, as amended, to obtain an advisory verdict of a jury in this case.

As a member of the court en banc, however, I am faced with the unequivocal findings of the learned hearing judge that proponent and Thompson were truthful and that he believed their testimony. It is well settled that the findings of fact of an auditing judge or a hearing judge, sitting as a chancellor, like the verdict of a jury, are binding upon the court en banc and the appellate courts and will not be disturbed unless clear error has been shown: Pavlinko Estate, 399 Pa. 536, 541; Snyder Estate, 368 Pa. 393, 397; Faller Estate, 407 Pa. 73, 77; Roberts Estate, 350 Pa. 467; Schultz's Estate, 24 D. & C. 546, 549; see Izzi v. DiTomo, 413 Pa. 461. Hence, I consider myself bound by the aforesaid findings of fact of the learned hearing judge, for whom I have great respect. Therefore, notwithstanding the bizarre facts in the instant case, which may prove the axiom "truth is stranger than fiction," his decree must stand.

Accordingly, I reluctantly concur in the result reached by the majority.